UNITED STATES of America, Plaintiff–Appellee,

v.

Jack C. TURNER, Defendant–Appellant.

No. 87–5735.

United States Court of Appeals, Eleventh Circuit.

May 9, 1989.

---

Joel Kaplan, Miami, Fla., for defendant-appellant.

Dexter Lehtinen, U.S. Atty., David A. Acton, Sonia Escobio O'Donnell, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before TJOFLAT and JOHNSON, Circuit Judges, and BROWN *, Senior Circuit Judge.

JOHNSON, Circuit Judge:

This case arises on appeal from appellant's conviction on one count of conspiracy

---

* Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designa- tion.

to transport stolen securities in violation of 18 U.S.C.A. § 371 and two counts of transporting stolen securities in interstate commerce in violation of 18 U.S.C.A. §§ 2 and 2314. We affirm.

## I. FACTS

On November 16, 1984, a federal grand jury in the Southern District of Florida issued a three-count indictment against appellant Jack C. Turner. In Count I, the indictment charged Turner with conspiracy to transport seventy stolen bearer bonds from Philadelphia to West Palm Beach and conspiracy to transport a check in the amount of $341,626.25, representing the proceeds from the sale of the bearer bonds, from Florida to London, England, in violation of 18 U.S.C.A. § 371. In Count II, the indictment charged Turner with aiding and abetting the transportation of stolen bearer bonds from Philadelphia to West Palm Beach in violation of 18 U.S.C.A. §§ 2 and 2314. In Count III, the indictment charged Turner with aiding and abetting the transportation of a check for $341,626.25 from Florida to London, England, in violation of 18 U.S.C.A. §§ 2 and 2314.

This prosecution arose from the theft of 169 bearer bonds issued by the Idaho Housing Agency and purchased by Manufacturers Hanover Trust of New York. The theft occurred sometime between November 1982, when Manufacturers Hanover Trust purchased the bonds for First Interstate Bank, and December 1982, when First Interstate Bank realized it had never received the bonds. Lewis, who originally possessed the bonds, and Bushey, his partner, decided to liquidate seventy of the bonds. Two intermediaries, Coyne and Boone, approached appellant Turner to see if Turner would help sell the bonds. Turner checked with an independent source to determine if the bonds had been designated as stolen. When he was assured that the relevant reporting institution did not yet identify these bonds as stolen, Turner agreed to help in return for a thirty-five percent share of the proceeds from the sale of the bonds.

On November 16, 1982, Coyne flew to Miami from Philadelphia at Turner's expense where he met with Turner and another man named Jackson. Lewis had also flown to Miami with the bonds, although at his own expense. Lewis gave the bonds to Coyne, who in turn showed the bonds to Turner. After discussing ways to sell the bonds, Turner and Coyne agreed to have Coyne's brother Michael cash in the bonds in return for a fee of fifteen thousand dollars. Turner agreed to send Michael Coyne a plane ticket to fly from Philadelphia to Miami. When Michael Coyne arrived in Miami, he checked into a hotel using Turner's credit card under the alias of Michael Cox.

On November 18, 1982, Turner took Michael and John Coyne to Hanover Stern, a firm that deals exclusively in municipal and tax free bonds. Michael Coyne, still using the name Michael Cox, delivered the bonds to Joe Jean, a broker at Hanover Stern, with the understanding that the bonds would be sent to New York City and that the proceeds would be available in approximately one week. Immediately after the transaction was completed, Turner drove John and Michael Coyne to the airport. On the way, Turner explained that he would receive thirty-five percent of the proceeds, while the Coynes would receive thirty percent.

When Michael Coyne returned to West Palm Beach nine days later to pick up his share of the proceeds, he discovered that the check for the proceeds had gone to London to be cashed. That check was never cashed. The British police arrested the holder of the check, Jackson, when Jackson attempted to cash it through a recognized member of the London criminal underworld, Stafford, whom the British police had been investigating. When Stafford met Jackson in Jackson's hotel room, the police monitored and recorded the conversations. The British police also recorded conversations between Jackson and a female companion, Stanfield. This continued until December 2, 1982, when the British police arrested Jackson, Stafford, Stanfield, and Bushey, who had traveled to London from Switzerland to meet with Jackson.

Turner was convicted on all three counts charged in the indictment. On Count One, the conspiracy count, he was sentenced to eighteen months' incarceration and fined $5,000. On Count Two, transportation of the bonds from Philadelphia to West Palm Beach, he received five years' probation. On Count Three, transportation of the bonds from Florida to London, he received five years' probation to be served concurrently with the probation imposed on Count Two. The probation was to run consecutive to the incarceration.

Turner raises three issues on appeal. He argues that the district court erred in instructing the jury on the elements of 18 U.S.C.A. § 2314; that the government violated the district court's discovery order by failing to provide him prior to trial with transcripts of conversations recorded in London and that the district court erred by not excluding the evidence as a sanction; and that the district court erred by admitting evidence of these conversations because they constituted inadmissible hearsay.

## II. DISCUSSION

### A. *Jury Instruction*

Turner challenges the district court's jury instruction on the elements of 18 U.S.C.A. § 2314. Section 2314 makes illegal the transportation "in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud...." The district court's original jury instruction on knowledge was as follows:

> The proof need not show who may have stolen the property involved, only that the Defendant knew it had been stolen or taken by fraud *at the time it was transported.*

(emphasis added) After the jury began deliberating, it requested clarification of the underlined portion of the charge. The jury asked, "Does the time in Count II end once the 70 bonds arrived in West Palm Beach?" The district court responded, "No, please follow all the Court's instructions as a whole." Turner argues that this response

was incorrect on the law, and that the response allowed the jury to convict him of a crime not charged in the indictment.

■■■ The district court has broad discretion in formulating a jury charge so long as the charge as a whole accurately reflects the law and the facts. *United States v. Silverman,* 745 F.2d 1386, 1395 (11th Cir.1984); *United States v. Walker,* 720 F.2d 1527, 1541 (11th Cir.1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). This Court will not reverse a conviction unless, after examining the entire charge, the Court finds that the issues of law were presented inaccurately, *United States v. Gordon,* 817 F.2d 1538, 1542 (11th Cir.1987) (per curiam), *vacated in part,* 836 F.2d 1312 (11th Cir.), *cert. dismissed,* —— U.S. ——, 109 S.Ct. 28, 101 L.Ed.2d 979 (1988); the charge included crimes not contained in the indictment, *United States v. Peel,* 837 F.2d 975 (11th Cir.1988); or the charge improperly guided the jury in such a substantial way as to violate due process. *United States v. Pruitt,* 763 F.2d 1256 (11th Cir. 1985), *cert. denied,* 474 U.S. 1084, 106 S.Ct. 856, 88 L.Ed.2d 896 (1986).

■■■ The district court's answer to the jury's question, that the time by which defendant had to know the bonds were stolen in Count II did not end once the bonds arrived in West Palm Beach, accurately reflected the law. Turner violated 18 U.S.C.A. § 2314 and 18 U.S.C.A. § 2 if he aided in the transportation of stolen bonds within a single state if that intrastate transportation was a continuation of interstate transportation. *United States v. Block,* 755 F.2d 770, 774 (11th Cir.1985) (citing *McElroy v. United States,* 455 U.S. 642, 654, 102 S.Ct. 1332, 1339, 71 L.Ed.2d 522 (1982) ("the stream of interstate commerce may continue after a state border has been crossed")). The bonds need not have been stolen at the time they crossed state lines, and therefore defendant need not have known that the bonds were stolen when they entered Florida. In fact, the bonds need not even have crossed state lines as long as they were in interstate transportation. *United States v. Schar-*

*dar,* 850 F.2d 1457, 1461 (11th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 326, 102 L.Ed.2d 343 (1988). The district court correctly responded to the jury's question because the transportation of the bonds within the State of Florida was a continuation of the transportation of the bonds from Philadelphia to West Palm Beach. *See generally Block,* 755 F.2d at 775.

■ Turner argues that the district court's response enabled the jury to convict him of a crime not charged in the indictment. *See United States v. Stirone,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) (criminal defendant has right to be tried on only charges contained in the indictment). The indictment charged Turner with aiding and abetting the interstate transportation of stolen bonds from Philadelphia to West Palm Beach. The district court correctly responded to the jury's question, and then referred the jury to the charge as a whole. That charge mirrored Count Two of the indictment. Comparing the jury charge with the indictment, we hold that defendant was not convicted of a crime not charged in the indictment.

The jury charge and the court's response as a whole accurately reflected the facts and the applicable law. *See generally United States v. Bent,* 707 F.2d 1190, 1195 (11th Cir.1983), *cert. denied,* 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984) (review of supplemental jury instruction involves review of all instructions given to determine whether instructions as a whole accurately presented the law). To the extent the district court's response may have included some risk of confusing the jury, it did not by itself so infect the entire trial that Turner's conviction must be overturned as a violation of due process. *See generally United States v. Pruitt,* 763 F.2d at 1260. Consequently, we find no reversible error in the district court's jury charge or in its response to the jury's request for clarification of the charge.

**B.** *Discovery Violation*

Between November 29, 1982, and December 2, 1982, the British police recorded conversations in London between Jackson, who had the check representing the proceeds from the sale of the stolen bonds, and Stafford, the British citizen who was to liquidate the check. The British police also recorded conversations between Jackson and Stanfield, a female acquaintance. British Inspector McGoohan testified at trial regarding the substance of these conversations, and the United States used transcripts made of the conversations to refresh Inspector McGoohan's recollection during his testimony. Defendant argues that the United States violated the Standing Discovery Order in the Southern District of Florida by failing to provide him prior to the trial with tape recordings and transcripts of these conversations. The district court entered the discovery order on December 3, 1984, and patterned the order after the provisions of Fed.R.Crim.P. 16(a)(1)(A).

Defendant argues that Fed.R.Crim.P. 16(c)[1] required the government to notify him of the existence of the transcripts once it received them, because the transcripts were subject to a request submitted under Fed.R.Crim.P. 16(a)(1)(C) and were subject to the Standing Discovery Order. Fed.R.Crim.P. 16(a)(1)(C) provides:

> Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

Defendant argues that because the government violated Rule 16(c), the district court should have excluded McGoohan's testimo-

---

**1.** Rule 16(c) provides: "If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under this rule, such party shall promptly notify the other party or that other party's attorney or the court of the existence of the additional evidence or material."

ny as a sanction. We assume for purposes of this discussion that the government violated Rule 16(c) by failing to comply with either Rule 16(a)(1)(C) or the district court's discovery order.[2]

 Under Fed.R.Crim.P. 16(d)(2), the district court had the power to enforce its discovery orders. The district court's exercise of that power was a matter of discretion, and will be reversed only for an abuse of that discretion. *See United States v. Fernandez*, 780 F.2d 1573, 1576 (11th Cir. 1986) (per curiam). As a general rule, the district court should impose the least severe sanction necessary to ensure prompt and complete compliance with its discovery orders. *See generally United States v. Euceda–Hernandez*, 768 F.2d 1307, 1312 (11th Cir.1985). Factors for the district court to consider in deciding to impose a sanction include reasons for the delay in complying with the discovery order, whether there was any bad faith on the part of the prosecution, prejudice to the defendant, and the availability of a means to cure the prejudice, including continuances and recesses. *Fernandez*, 780 F.2d at 1576 (quoting *Euceda–Hernandez*, 768 F.2d at 1312).

 There is no indication of bad faith on the part of the government in this case. Additionally, this is not a case where the government's failure to comply with the discovery order prejudiced substantial rights of the defendant. *See, e.g., United States v. Rodriguez*, 799 F.2d 649, 652 (11th Cir.1986) (defendant must show prejudice to substantial rights for this Court to

reverse discretion of trial court in choosing sanction for discovery violation). Although the time was short, defendant suffered no prejudice because defense counsel already knew the substance of the conversations. *See United States v. Chestang*, 849 F.2d 528, 532 (11th Cir.1988) (no prejudice to defense from Rule 16 violation because defense already knew the substance of the nondelivered materials). Finally, the trial court cured any prejudice to defendant by granting a recess to allow defense counsel to read the transcripts.

Defendant argues that the trial court should have excluded McGoohan's testimony as a sanction. The district court had the power to exclude this testimony, *cf. Taylor v. Illinois*, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), but exclusion of relevant evidence is an extreme sanction. *United States v. Euceda–Hernandez*, 768 F.2d at 1313–14. The district court was correct in not choosing it. *Cf. United States v. Burkhalter*, 735 F.2d 1327, 1329–30 (11th Cir.1984) (per curiam) (district court abused discretion in preventing full use of testimony as sanction for discovery violation when less severe sanction was available). Assuming the government violated a discovery rule, we hold that the district court did not abuse its discretion under Rule 16(d)(2) by ordering the government to allow defense counsel to read the transcripts during lunch and overnight recesses as a remedy for the government's failure to provide defense counsel with the transcripts prior to trial.

2. It is unclear when the United States came into possession of the tapes and the transcripts. The United States claims it never received the tapes, and received the transcripts on June 20, 1987, the Saturday before trial. Defense counsel argues that the United States had the tapes and transcripts since 1983. The government also argues these tapes were not subject to Rule 16 because they did not involve statements made by the defendant, were not to be introduced at trial, and were not material to the preparation of the defense. *Compare United States v. Parikh*, 858 F.2d 688, 694–95 (11th Cir.1988) (nondisclosure of letters from anonymous informant not offered into evidence did not violate Rule 16(a)(1)(C)) *with United States v. Noe*, 821 F.2d 604 (11th Cir.1987) (reversing conviction be-

cause prosecution failed to disclose tape recording of defendant introduced at trial); *United States v. Barragan*, 793 F.2d 1255, 1259 (11th Cir.1986) (government obliged to deliver tapes of defendant to be introduced at trial). The government argues it did not violate the discovery order because the discovery order applied only to evidence either intended to be introduced by the government in its case in chief or obtained from or belonging to the defendant. The district court, without resolving this dispute, ordered the United States to provide the defense with a copy of the transcripts and granted a recess during the trial to give the defense an opportunity to review the transcripts.

## C. Coconspirator Statements

Petitioner claims that the district court erred in admitting McGoohan's testimony about conversations in London between Jackson and Stanfield. The British police had recorded all conversations in Jackson's hotel room between November 30, 1982, and December 2, 1982. Many of these conversations were between Jackson and Stanfield, an intimate female acquaintance. British Inspector McGoohan testified about these conversations as they related to the conspiracy and to Turner's role in it. Defendant argues that the testimony about these conversations included hearsay inadmissible under Fed.R.Evid. 802. The United States argues that these statements were admissible as coconspirator statements under Fed.R.Evid. 801(d)(2)(E).

■■■ In order to qualify as a coconspirator statement, there must have existed a conspiracy involving the declarant and the defendant, and the statement must have been made during the course and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987); *see* Fed. R.Evid. 801(d)(2)(E). In this case, independent evidence established that Jackson was part of the conspiracy and that the statements were made during the course of that conspiracy. The dispute focuses on whether the statements were made in furtherance of the conspiracy. This Circuit applies "a liberal standard in determining whether a statement is made in furtherance of a conspiracy." *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988). The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way. *United States v. Caraza*, 843 F.2d 432, 436 (11th Cir.1988) (per curiam). Statements made to solicit membership or participation in the conspiracy, for exam-

ple, *United States v. Montes–Cardenas*, 746 F.2d 771, 780 (11th Cir.1984), or statements explaining the conspiracy to a new member, *see generally United States v. Reyes*, 798 F.2d 380, 384 (10th Cir.1986), are made in furtherance of the conspiracy. The determination of whether a statement is made in furtherance of a conspiracy is a finding of fact subject to a clearly erroneous standard of review. *United States v. Ayarza–Garcia*, 819 F.2d 1043, 1050 (11th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987). A finding of fact is clearly erroneous when after reviewing the entire evidence the reviewing court "is left with a definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

■■■ In this case, the government introduced evidence of conversations between Jackson and Stanfield regarding the risks of cashing the check, the level of payment Jackson and the others were to receive, and how the money was to be transported back to the United States. The district court necessarily found these statements to have been made in furtherance of the conspiracy. That conclusion is not clearly erroneous.

■■■ Even if the evidence were erroneously admitted, however, petitioner would not be entitled to prevail on appeal because that error would be harmless beyond a reasonable doubt. *See generally Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986) (no reversal of conviction if Confrontation Clause violation harmless beyond a reasonable doubt).[3] The error is harmless

**3.** Introduction of out-of-court statements implicates a criminal defendant's Sixth Amendment right to confront the witnesses against him. *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). Such statements do not violate the defendant's Confrontation Clause rights if (1) the declarant is unavailable and (2) the statement bears adequate indicia of reliabili-

ty. *United States v. Caporale*, 806 F.2d 1487, 1512 (11th Cir. 1986), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987). A statement that is admitted pursuant to a valid exception to the hearsay rule automatically bears adequate indicia of reliability. *Id.* Coconspirator statements, although technically not hearsay

if there is no "reasonable probability that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963); *see also United States v. Taylor*, 792 F.2d 1019, 1027 (11th Cir.1986) (no reversible error in erroneous admission of hearsay evidence because remaining evidence supported conviction beyond a reasonable doubt), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1957, 95 L.Ed.2d 530 (1987); *United States v. Cruz*, 765 F.2d 1020, 1025 (11th Cir.1985) (the evidence was sufficient to negate any reasonable doubt as to whether the error contributed to the conviction). Factors to consider include the importance of the evidence to the prosecution, whether the evidence was cumulative, and the overall strength of the prosecution's case. *Cf. Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438 (discussing inability to cross-examine witness as Confrontation Clause violation).

In this case, there was overwhelming independent evidence that Turner knowingly participated in the scheme to transport the stolen bonds to Florida, sell them, and transport the check from the brokerage house to London for liquidation. McGoohan's testimony was primarily cumulative, and corroborated by other testimony. We hold therefore that even if the district

court erred in admitting this evidence, the error was harmless beyond a reasonable doubt.

 Petitioner also argues that the district court erred by allowing McGoohan to read from the transcripts. It is true that the district court had the obligation to prevent McGoohan from putting the content of these transcripts into evidence under the guise of refreshing his recollection. *United States v. Scott*, 701 F.2d 1340, 1346 (11th Cir.), *cert. denied*, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 158 (1983). The district court did so in this case, admonishing McGoohan when he began to read. This is not reversible error. After reviewing the record, we conclude that the district court's evidentiary rulings do not provide a basis for reversing defendant's convictions.

### III. CONCLUSION

Turner's convictions for violating 18 U.S. C.A. § 371 and 18 U.S.C.A. §§ 2 and 2314 are AFFIRMED.

under Fed.R.Evid. 801(d)(2)(E), fit within this

general hearsay exception rule. *Id.*